UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

MARIO JULIO RODRIGUEZ

                Plaintiff

-against-

THE CITY OF NEW YORK;
Detective LOUIS DEMARCO, Shield No. 1911 and
SGT. KEITH DEGIORGIO,
Individually and in their official capacities as
NEW YORK CITY POLICE OFFICERS.

                Defendants.
-------------------------------------------------------------X

COMPLAINT

17 CV____ ( ) ( )

Jury Trial Demanded

Plaintiff, Mario Julio Rodriguez, by his attorney, Rudy Velez, Esq., complaining of the defendants, The City of New York, and its employee police officers, collectively referred to as Defendants, upon information and belief alleges as follows:

## NATURE OF THE ACTION

1. This an action to recover money damages arising out of the violation of plaintiff's rights under the Constitution.

## JURISDICTION AND VENUE

2. This action is brought pursuant to 42 U.S.C ss1983 and 1988, and the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States.

3. The Jurisdiction of this Court is predicated upon 28 U.S.C §§ 1331 and 1343.

4. Venue is proper in this district pursuant to 28 U.S.C §§ 1391 (b) and (c).

## JURY DEMAND

5. Plaintiff demands a trial by jury in this action.

## PROCEDURAL HISTORY

6. On February 21, 2017, Plaintiff served a Notice of Claim in writing sworn on Plaintiff's behalf upon Defendant CITY, by delivering a copy thereof to the officer designated to receive such process personally, which Notice of Claim advised the Defendant of the nature, place, time, and manner in which the Claim arouse, and items of damage and injures sustained so far as was then determinable.

7. More than thirty days have elapsed since service of said notice, and defendant CITY had failed to pay or adjust this claim.

8. A 50-H hearing has been held.

9. This action had been commenced within one year and ninety days after the cause of action of Plaintiff accrued.

10. Plaintiff has duly complied with all conditions this to the commencement

## PARTIES

11. Plaintiff Mario Julio Rodriguez ("Mr. Rodriguez") is a resident of Bronx County in the City and State of New York.

12. Defendant Detective Louis DeMarco, Shield No. 1911 ("DeMarco"), at all times relevant herein, was an officer, employee and agent of the NYPD. Defendant Demarco is sued in his individual and official capacities.

13. Defendant Sgt. Keith DeGiorgio, ("DeGiorgio"), at all times relevant herein, was an officer, employee and agent of the NYPD. Defendant DeGiorgio is sued in his individual and official capacities.

14. The Defendant, City of New York is a municipality in the State of New York and employs the Defendant Police officers.

## STATEMENT OF FACTS APPLICABLE TO ALL COUNTS

15. At approximately 10:30 pm on October 24, 2016, Plaintiff, was lawfully at the North E. Corner of West Fordham Road and Cedar Avenue, Bronx, New York.

16. At around 10:30pm, Defendants Detective and Defendant Sgt., Assigned to the Drug Enforcement Task Force, without probable cause and or justification, unlawfully arrested and detained the Plaintiff, Mr. Rodriguez.

17. The Plaintiff was subsequently charged PL 220.21, Criminal Possession of a Controlled Substance in the first degree. All charges were subsequently dismissed by a New York County Grand Jury on November 29, 2016.

18. Prior to and after effecting the illegal arrest against Mr. Rodriquez, Mr. Rodriquez was acting as a licensed cab driver, with no knowledge of any crime. The police claim they recovered approximately four kilograms of cocaine from a box in the trunk of Mr. Rodriguez's cab.

19. Pursuant to a short-term investigation, the police observed Mr. Rodriguez park his cab at 289 Bergen Blvd, Fairview, New Jersey and open the trunk and hood of his vehicle.

Shortly thereafter, the police claim they observed and unknown male drive next to Mr. Rodriguez, and park his car.

20. The police claim to then observe Mr. Rodriguez speak to the unknown male who the police claim took a box from his backseat and hand it to Mr. Rodriguez.

21. The Police then falsely claim that Mr. Rodriguez placed said box in the trunk of his 2016 Toyota Camry, close to the trunk and drive off, Mr. Rodriguez never touched the box, knew its contents or placed it in his cab's trunk.

22. Shortly thereafter, in the vicinity of West Fordham Road and Cedar Avenue, in the County of the Bronx, State of New York, the police officers named herein pulled over Mr. Rodriguez's cab and then summarily searched the vehicle and the box containing the cocaine.

23. The police questioned Mr. Rodriguez and Mr. Rodriguez fully cooperated with them explaining to the police how he received a call from a fellow cab driver who worked at the same taxi base that Mr. Rodriguez worked at the time and then proceeded to New Jersey to pick a fare intended for his fellow cab driver colleague.

24. When Mr. Rodriguez arrived at the parking lot in New Jersey he expected to pick a fare but instead was told by the unknown male that he wished to have a box delivered to an address in the Bronx. The unknown male placed the box in Mr. Rodriguez's cab trunk and instructed Mr. Rodriguez to deliver it to a certain address in the Bronx. Mr. Rodriguez was authorized to deliver packages as a licensed New York City Taxi and Limousine Commission ("TLC") cab driver whose Toyota Camry bore TLC plates.

25. Subsequent to Mr. Rodriguez's arrest he was photographed, booked and processed at central booking. He was arraigned on the aforementioned charges but was unable to meet the high bail set by the New York County Criminal Court Judge.

26. On November 29, 2016, Mr. Rodriguez testified before a New York County grand Jury regarding his case and after hearing Mr. Rodriguez's testimony and Mr. Rodriguez answering all questions put to him, a NO TRUE BILL was voted and all the charges were dismissed. Mr. Rodriguez spent over 35 days incarcerated and suffered not only a loss of his freedom, but a great financial loss including the loss of his cab, and alienation from his wife and family.

27. Plaintiff suffered damage a s a result of defendants' actions. Plaintiff suffered emotional distress, mental anguish, fear, severe anxiety, embarrassment, and humiliation, damage to his reputation, financial collapse and loss of freedom.

### FIRST CLAIM

### Malicious Prosecution

**28. Plaintiff repeats and alleges each and every allegation as if fully set forth herein.**

29. By their conduct, as described herein, and acting under color of state law, defendants are liable to plaintiff Mario Julio Rodriguez under 42 U.S.C § 1983 for the violation of his constitutional rights to be free from malicious prosecution under the Fourth and Fourteenth Amendments to the United States Constitution.

30. Defendant's unlawful actions were done willfully, knowingly, with malice and with the specific intent to deprive plaintiff of his constitutional rights. The prosecution by defendants of plaintiff Mario Julio Rodriguez constituted malicious prosecution in that

here was no basis for the plaintiff's arrest, yet defendants continued with the prosecution, which was resolved in plaintiff's favor.

31. As a direct and proximate result of defendant's unlawful actions, plaintiff has suffered, and will continue to suffer, damages, including mental and emotional injury, mental anguish, suffering, humiliation, embarrassment, and was incarcerated for 35 days.

## SECOND CLAIM

### Monell Claim

**32. Plaintiff repeats and alleges each and every allegation as if fully set forth herein**

33. The acts complained of were carried out by the aforementioned POLICE DEFENDANTS in their capacities as POLICE OFFICERS and officials pursuant to customs, policies, usages, practices, procedures and rules of the City an NYPD, all under the supervision of ranking officers of the NYPD.

34. The aforementioned customs, practices, procedures and rules of the City and NYPD include, but are not limited to: 1" arresting persons known to be innocent in order to meet "productivity goals"; 2) falsely searing out criminal complaints and/or lying and committing perjury during sworn testimony to protect other officers and meet productivity goals; 3) failing to supervise, train, instruct and discipline police officers thereby encouraging their misconduct and exhibiting deliberate indifference toward the constitutional rights of persons within the officers' jurisdiction; 4) discouraging police officers from reporting the corrupt or unlawful acts of other officers; 5) retaliating against officers who report police misconduct; and 6) failing to intervene to

prevent the above-mentioned practices when they reasonably could have been prevented with proper supervision.

35. At the time of the aforementioned constitutional violations, the City of NYPD were and had been on notice of such unconstitutional conduct, customs, and de facto policies, such as the failure of the City and NYPD to take appropriate remedial action amounted to deliberate indifference of the constitutional rights of persons with whom the police come in contact. In light of the extensive pattern of well-settled, pervasive customs and policies causing constitutional violations, documented in part "infra", the need for more effective supervision and other remedial measures was patently obvious, but the City and NYPD made meaningful attempt to prevent future constitutional violations.

36. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented by the following civil rights actions and parallel prosecutions of police officers:

   a. Schoolcraft v. City of New York, 10-CV-6005 (RWS) (S.D.N.Y) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing these practices and customs);

   b. Long v. City of New York, 09-CV-6099 (AJK)(S.D.N.Y); People v. Pagan, 6416-2008 (Sup. Ct. N.Y. Co.)(officer swears out a false complaint and is convicted of falsifying police records);

   c. Taylor v. City of New York, 09-CV-7923 (RWS)(S.D.N.Y)(police officers at 24th precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint review Board against the precinct);

d. Lin v. City of New York, 10-CV-1936 (PGG)(S.D.N.Y) (officers arrest a person lawfully photographing an arrest of a bicyclist in Times Square and swear out criminal complaints that are contradicted by video evidence);

e. Colon v. City of New York, 9-CV-0008 (JBW)(E.D.N.Y) (In an Order dated November 29, 2009 denying the City's motion to dismiss on Igbal/Twombley grounds, wherein the police officers at issued were and prosecuted for falsifying evidence, the Honorable Jack B. Weinstein wrote:

> 'informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration-through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department-there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged'

f. People v Arbeedy, 6314-2008 (Sup. Ct. Kings Co.) (NYPD narcotics detective found guilty planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testified that fellow narcotics officers routinely maintained a stash of narcotics to pant an innocent civilians in order to help those officers meet arrest quotas; Mr. Anderson testified concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrest stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion to it. The mentality was that they attach bodies to it; they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came to me and I accepted it- being around so long, and being an undercover"; The presiding judge, Justice Reichbach, stated "Having been a judge for 20 years, I thought I was not naïve regarding the reality of narcotics enforcement. But even the Court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed.");

g. Bryant v. City of New York, 22011/2007 (Sup. Ct. Kings Co.)(Jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrest officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest);

h. Williams v. City of New York, 06-CV-6601 (NGG) (E.D.N.Y.)(officers arrest during a "vertical patrol" of a public housing project despite evidence that he had legitimate reason to be on premises);

i. MacNamara v. City of New York, 04-CV-9216(RJS)(JCF) (S.D.N.Y) (evidence of perjured sworn statements systematically provided by officers to attempt to cover up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

j. McMillan v. City of New York, 04-CV-3990 (FB)(RML) (E.D.N.Y.)(Officers fabricated evidence against an African-American man in Kings County and initiated drug charges against him, despite an absence of an quantum of suspicion);

k. Avent v. City of New York, 04-CV-2451 (CBA) (CL) (E.D.N.Y.) (same);

l. Smith v. City of New York, 04-CV-1045 (RLM) (E.D.N.Y.) (same);

m. Powers v. City of New York, 04-CV-2246 (NGG) (E.D.N.Y,) (police officer alleges unlawful retaliation by other police officers after testifying about corruption in the NYPD);

n. Nonneman v. City of New York, 04-CV-10131 (JSR)(AJP) (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and–frisk of a group of Hispanic youths);

o. Richardson v. City of New York, 02-CV-3651 (JG)(CLP) (E.D.N.Y.)(Officer fabricated evidence including knowingly false sworn complaints, against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

p. Barry v. City of New York, 01-CV-10627 (CBM) (S.D.N.Y.)(triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary chares in response to sergeant's allegations of corruption within her unit and alleged the NYPD had "unwritten but persuasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

q. White-Ruiz v. City of New York, 93-CV-7233 (DLC) (MHD), 983 F. Supp. 365 380 (S.D.N.Y., 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption"); and

r. Ariza v. City of New York, 93-CV-5287 (CPS), 1996 U.S. Dist. Lexis 20250 at 14(E.D.N.Y.) (Police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of policy to regulate against police officers who exposed police misconduct and a failure to train in the police department).

37. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints or otherwise falsifying or fabricating evidence,** are further evidenced, inter alia, by the following:

   a. The Mollen Commission concluded that police and falsification of official records is probably the most common form of police corruption facing the criminal justice system, It concluded:

   > Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their superiors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrest and never questioned them.
   >
   > {...}
   >
   > What breeds this tolerance is deep-rooted perception among many officers of all ranks within the Department that there is nothing really wrong with compromising the facts to fight crime in the real world. Simply put, despite devastating consequences of police falsifications, there is a persistent belief among officers that it is necessary and justified, even if it is unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" - doing whatever it takes to get the suspected criminal off the streets. This is so entrenched, especially in high-crime precincts, that when investigators confronted one

recently arrested officer with evidence of perjury, he asked in disbelief, "what's wrong with that? They're guilty."

b. In June 2011, in the case in New York County Supreme Court entitled People v. William Eiserman (Ind No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eisenman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."

c. In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed" when, in fact, two other officers had made the arrest and handed the arrest off to Corniel. The suspect was released. Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.
>
> That is a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.
>
> What has authorities particularly troubled is that officers historically lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.
>
> But internal probers are not finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told the Post.
>
> Their reasons could range from trying to cut down on paperwork to being lazy when filing arrest and incident reports.

d. In 2007, former NYPD officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting the brothel. Mr. Kim was convicted of those offenses. The 109th precinct of the NYPD, which used to be under Mr. Kim's command, is also under investigation by the United States Attorney's Office for "Planting

drugs on suspects and stealing cash during gambling raids." The 109[th] precinct to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to being legitimacy to the arrest. According to the Assistant United States Attorney Monica Evans, member of the 109[th] Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."

e. In December 2009, two officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from Internal Affairs Bureau. As explained in the New York Post:

> The Officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.
>
> Sometime later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.
>
> [Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30 cuffed him, but they claimed that they had seen him selling the bogus butts to two people, according to sources.
>
> Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.
>
> To complete ruse, the undercover cop was processed at the station house so as not to tip off Stukes and Tirado about the sting...
>
> [P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.
>
> "There's pressure on the cops from the bosses and they're getting pressured from headquarters,' a police source told The Post.
>
> The officers were indicted for felony perjury, filing a false report and filing a false instrument.

f. In early 2010, the City settled a civil rights lawsuit wherein one officer Sean. Spence falsely arrested and accused a 41-year-old grandmother of prostitution, promising to pay the women $35,000. In Court documents, Caroline Chen, the attorney representing the City in the case admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense.

    g. Separate grand jury investigations into drug-related police corruption in the Bronx; and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations- in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct- are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.

38. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct, and discipline police officers, encouraging their misconduct, and exhibiting deliberate indifference towards the constitutional rights of persons with whom officers come into contact** are further evidenced, <u>inter alia</u>, by the following:

    a. With respect to Fourth Amendment violations, in <u>Ligon v. City of New York</u>, 2013 WL 628534 (Feb. 14, 2013), Judge Scheindlin found that PLAINTIFFS challenging allegedly unconstitutional policies and practices of the NYPD had shown "a clear likelihood of proving deliberate indifference under any of the prevailing ways of framing that standard, " including failure to train and constructive acquiescence. Judge Scheindlin specifically rejected the NYPD's argument that broad, general remedial measures taken in 2012, such as an instructional video on stop and frisk, was meaningful action rebutting a finding of deliberate indifference.

    b. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report") dated July 7, 1994, states: In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate than the devastating consequences of corruption itself. As a result, its corruption control ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption rather than root it out. Such

an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted-especially a Department that needs the public's confidence and partnership to be affective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.

c. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

d. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in Colon v. City of New York, 09-CV-00008 (E.D.N.Y.), in which he noticed a "widespread...custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, NYPD Commissioner Raymond Kelly acknowledged, "when it happens, it's not for personal gain. It's more for convenience."

e. In a recent instance, NYPD officer Lieutenant Daniel Sbarra was involved in 15 suits against the city resulting to date in over $1.5 million in settlement payments, was the target of 5-10 Internal Affairs investigations, and was the subject of at least 30 complaints filed with the Civilian Complaint Review Board. Not only have Commissioner Kelly and the NYPD failed to meaningfully discipline or control officer Sbarra-they promoted him to the rank of Lieutenant four months after he lost 20 days of vacation upon pleading guilty to Internal Affairs charges relating to an unconstitutional search. This show, at best, deliberate indifference towards the constitutional rights of citizens with whom Sbarra comes into contact, and further demonstrates tacit approval, condonement, and/or encouragement of unconstitutional policies, customs, and practices.

f. Regarding defendant City's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a City agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct. When it does, however, Commissioner Kelly controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject

officer(s). Since 2005, during Kelly's tenure, only one quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% IN 2007, and approximately 30% in 2008. Alarmingly, the NYPD had refused to prosecute 40% of the cases sent to it by the CCRB in 2009. As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions of the matter was simpy dropped by the NYPD rose 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.

39. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct, failure to supervise, train, instruct, and discipline police officers, encouraging their misconduct,** are further evidenced, inter alia, by the following:

   a. In a suit filed in 2012, officer Craig Matthews alleged that he was systematically retaliated against for speaking to his precinct commanders about the pressure that the NYPD's illegal quota system placed on officers.

   b. In Griffin v. City of New York, 880 F. Supp.2d 384 (E.D.N.Y. 2012), Judge Dearie denied the city's motion to dismiss retaliation claims against a former NYPD detective who, after reporting a fellow officer's misconduct to the NYPD Internal Affairs Bureau, found the word "rat" written multiple times on his locker and faced other repercussions from fellow police officers that his supervisors failed to address.

   c. Former New York County District Attorney Robert Morgenthau had been quoted as acknowledged that, in the NYPD, there is "code of silence," or a "code of protection" that exist among officers and this is followed carefully;

    d. In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

    e. Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence is reinforced every day in every way."

40. The existence of the above-described de facto unlawful polices and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officers and officials of the NYPD and the City, including with limitation, Commissioner Kelly.

41. The actions of Defendants, resulting from and taken pursuant to the above-mentioned de facto policies and/or well settled and widespread customs and practices of the City, are implemented by members of the NYPD engaging in systematic and ubiquitous perjury, both oral and written, to cover up federal law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, commanders and Commissioners Kelly who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and the Internal Affair Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testifying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilian in order to cover-up civil rights violations perpetrated by themselves, fellow office supervisors and/or subordinates against those civilians.

42. All of the foregoing acts by defendants deprived PLAINTIFF of his federally protected rights, including, but limited to the constitutional rights enumerated herein.

43. Defendant City knew or should have known that the acts alleged herein would deprive PLAINTIFF of his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

44. Defendant City is directly liable and responsible for the acts of Defendants, as it repeatedly and knowingly failed to properly supervise, train, instruct and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulations of the City and NYPD, and to require compliance with the Constitution and laws of the United States.

45. Despite knowledge of such unlawful de facto policies, practices, and/or customs, these supervisory ad policy-making officers and officials of the NYPD and the City, including Commissioner Kelly, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead approve and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effects of said policies, practices and/or customs or the constitutional right of persons in the City of New York.

46. The aforementioned City policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the

aforementioned City policies, practices and/or customs, Defendants felt empowered to arrest PLAINTIFFS without probable cause and then fabricate and swear to a false story to cover up their blatant violations of PLAINTIFFS' Constitutional rights. Pursuant to the aforementioned City policies practices and/or customs, the officers failed to intervene in or report Defendants' violations of PLAINTIFF'S rights.

47. PLAINTIFF'S injuries were a direct and proximate result of the defendant City and the NYPD's wrongful de facto policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant City and the NYPD to properly supervise, the train and discipline their police officer.

48. As a result of the foregoing, PLAINTIFF was deprived of his liberty, endured psychological and emotional injury, humiliation, costs and expenses and suffered other damages and injuries.

## THIRD CLAIM

### 42 U.S.C. §1983 Federal Civil Rights Violations

49. Plaintiff repeats and alleges each and every allegation as if fully set forth herein.

50. PLAINTIFF repeats and realleges each and every allegation as if fully set forth herein.

51. All of the aforementioned acts of defendants, their agents, servants and employees were carried out under the color of law.

52. All of the aforementioned acts deprived PLAINIFF of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violations of 42 U.S.C § 1983.

59. The Defendants Officers acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employment ad NYPD officers. Said acts by the Defendants Officers were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said Defendants acted willfully, knowingly, and with the specific intent to deprive the Plaintiff of his constitutional rights secured by Article 1, Section 12 of the New York Constitution.

**WHEREFORE**, plaintiff respectfully requests judgement against the Defendants as follow:

1. On the First Cause of Action against all the defendants, compensatory damages in an amount to be determined at trial, and reasonable attorney's fees and costs under 42 U.S.C. Section 1988;

2. On the Second cause of Action, against all Defendants, compensatory damages in an amount in an amount to be determined at trial.

3. On the Third Cause of Action, against all Defendants, compensatory damages in an amount to be determined trial.

4. On the Fourth Cause of Action, against all Defendants, compensatory damages in an amount to be determined at trial.

5. Such other and further relief as this Court may deem necessary in the interest of justice.

Dated: February  , 2018
Bronx, New York

_____
Rudy Velez, Esq (RV-7160)
Attorney for Plaintiff
930 Grand Concourse
Suite 1A
Bronx, New York 10451
(917) 674-0573
Fax (212) 481-4853
rvesq@yahoo.com

rvesq@yahoo.com